HONORABLE RONALD B. LEIGHTON

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

| | |
|---|---|
| ENTERPRISES INTERNATIONAL, INC., a Washington corporation, on its own behalf and as a shareholder, on behalf of and for the benefit of L.-P. Inc., a Washington corporation,<br><br>Plaintiffs,<br><br>v.<br><br>PASABAN, S.A., et al.,<br><br>Defendants. | No. 11-cv-5919-RBL<br><br>ORDER<br><br>(Dkt. #50) |

Plaintiff Enterprises International markets equipment made by Defendant Pasaban. In this suit, Enterprises alleges that Pasaban has breached certain contracts by marketing directly in countries that Enterprises asserts are the exclusive territory of the parties' joint venture company. Pasaban moves to stay the proceedings and compel arbitration. The motion is granted.

## I. BACKGROUND

The parties have a lengthy, multi-decade relationship governed by multiple intertwined contracts that operate through a subsidiary. The Motion to Compel Arbitration hinges on the interplay of these contracts, and it is thus important to outline the entities and their agreements in some detail.

### A. Nature of the Relationship

Pasaban manufactures winders and sheeters, which are (apparently) machines used in paper mills. (*See* Pl.'s Resp. to Mot. to Compel Arbitration at 2, Dkt. #52.) In 1990, Pasaban

(through a subsidiary) and Enterprises formed a joint venture firm, called L.-P., Inc. (which is not short for anything, but refers to the names of the families that own these companies), to market these machines.[1]  The Complaint asserts that Pasaban began directly marketing the machines in territories reserved to L.-P., thereby usurping corporate opportunities.  (*See* Compl. ¶ 27, Dkt. #1.)

### B.  Subsidiary Entities and Contracts

To facilitate their plans, Pasaban, S.A. (a Spanish corporation) created a wholly-owned American subsidiary: Pasaban Americana, Inc. (a Washington corporation).  In January 1990, Pasaban licensed "in perpetuity the exclusive right to market and service" its machines in North America, Brazil, and Asia (with certain countries excepted) to Pasaban Americana.  (Lascurain Decl., Ex. A, Dkt. #22-1 (License Agreement)).  The parties have taken to calling this—the license from Pasaban to Pasaban Americana—the "PA License."

In March 1990, Pasaban and Enterprises formally agreed that "[Pasaban] will not modify [the PA License]" and that it "agrees to take all such steps as are necessary to achieve its terms and purpose."  (*Id.*, Ex. B, Dkt. #22-2.)  The agreement, which the parties refer to as the "Estoppel Agreement," bars Pasaban from interfering with Pasaban Americana's exclusive marketing rights.  And, as shall be important later, the Estoppel Agreement demonstrates that Pasaban Americana is merely an alter ego of its Spanish parent.  In the agreement, Pasaban agreed that its subsidiary "shall not refuse to market any product offered by [Pasaban] for sale in the Territory."  (*Id.*)  In effect, Pasaban and Enterprises acknowledge a rather obvious point: the American subsidiary has no existence independent of its parent.

A few months later, in July 1990, Enterprises and Pasaban Americana formed their joint venture, L.-P.  Enterprises controls L.-P., holding 51% of the company's shares.  (Lascurain Decl., Ex. D., Dkt. #22-4 (Shareholders' Agreement)).  The day after forming L.-P., the parties executed a second license agreement.  In it, Pasaban Americana re-licensed its exclusive

---

[1] The companies that entered these contracts were actually the predecessors to Pasaban and Enterprises.  But, because the corporate lineage is irrelevant, the Court will use only the current parties' names for clarity.  Although the parties at times refer to L.-P. as their "joint venture," the company is in fact a corporation and not a traditional joint venture partnership.

marketing rights to the joint venture, L.-P. (*Id.*, Ex. C, Dkt. #22-3.) The parties refer to this as the "LP License."

In sum, Pasaban and Enterprises formed their joint venture, L.-P., and Pasaban licensed exclusive marketing rights to it through Pasaban Americana, which is nothing more than the Spanish company's American alter ego. (*See* Order at 10, Dkt. #35; *see also* Pl.'s Resp. to Mot. to Dismiss at 9, Dkt. #30.) To ensure that Pasaban could not terminate the joint venture at will, it entered the Estoppel Agreement with Enterprises. Thus, the formation looks something like this:



### C. Plaintiffs' Claims

Plaintiffs—both Enterprises and L.-P.—assert that Pasaban, S.A. and its individual directors breached the LP License (Compl. ¶¶ 36–42) and the Estoppel Agreement (*id.* ¶¶ 43–48). They seek an accounting (*id.* ¶¶ 49–51) and a judgment declaring that Defendants violated the PA License and wrongfully marketed in L.-P.'s exclusive territory (*id.* ¶¶ 52–54). Plaintiffs also allege violations of the Washington Consumer Protection Act, Wash. Rev. Code § 19.86 (*id.* ¶¶ 55–69), and present derivative shareholder claims (*id.* ¶¶ 70–72).

### D. Procedural History

Enterprises argues that it first confronted Pasaban about the alleged improper marketing in January 2011. (Pl.'s Resp. at 3, Dkt. #52.)[2] In response to the confrontation, Pasaban

---

[2] Plaintiffs fail to cite these statements. In the future, the Court would appreciate if counsel would specify where support for these statements is found. However, because Defendants have not contested these facts, the Court will

terminated the PA License—that is, the license between Pasaban and Pasaban Americana—which meant that the latter could not re-license the marketing rights to L.-P.—effectively terminating the joint venture. (*See* Frush Decl., Ex. 1 at 3, Dkt. #53-1.)

Enterprises filed suit on November 9, 2011. (Compl., Dkt. #1.) Defense counsel appeared on November 28th. (Not. of Appearance, Dkt. #6.) The individual Defendants initially declined to waive service and faulted Plaintiffs for failing to obtain prior approval for service by mail. (Defs.' Resp. at 1, Dkt. #13.) Defendants eventually stipulated to service after Plaintiffs moved to compel confirmation of service by mail. (Pl.'s Mot. for Order Confirming Service *Nunc Pro Tunc*, Dkt. #10.) Following service, Defendants moved to dismiss, arguing that the Court lacked jurisdiction and that Washington was an improper forum. (*See* Defs.' Mot. to Dismiss, Dkt. #18.) The Court denied the motion, and Defendants served their first discovery requests in August 2012. (Frush Decl., Ex. 5, Dkt. #53.) Finally, Defendants filed the present motion in November 2012.

### E. Defendants' Motion to Compel Arbitration

Pasaban seeks to compel arbitration under a clause in the LP License: "Any dispute arising between any of the parties hereto and concerning this Agreement shall be arbitrated at Tacoma, Washington, or such other city as is mutually agreed upon by the parties, in accordance with the UNCITRAL Rules of Arbitration." (Lascurain Decl., Ex. C ¶ 12.1, Dkt. #22-3.) Pasaban acknowledges, however, that arbitration is not a foregone conclusion. First, as Plaintiffs argue, Pasaban, S.A. is not signatory to the LP License. Rather, its wholly-owned subsidiary, Pasaban Americana—an entity that Plaintiffs noticeably left out of this suit[3]—signed the LP License. Because it did not sign the LP License, Plaintiffs argue, Pasaban cannot invoke the arbitration clause it contains. Second, Plaintiffs allege violations of the Estoppel Agreement (between Enterprises and Pasaban, S.A.), which does not contain an arbitration clause. Third, Plaintiffs argue that Pasaban waived any right to arbitrate by engaging in this litigation, including discovery.

---

accept them as true for purposes of this motion (and because acceptance does not ultimately prejudice the outcome of Defendants' motion).

[3] Because the parties have not raised the issue, and it is not essential to this motion, the Court will not address whether Pasaban Americana is a required party under Fed. R. Civ. P. 19.

Pasaban argues, in short, that Plaintiffs have brought a breach of contract claim under the LP License itself, and further, they invoked the jurisdiction and venue clauses in response to Pasaban's motion to dismiss. Thus, it would be unfair to allow Enterprises to bring claims under the LP License and rely on the LP License for jurisdiction and venue but to dodge the agreement's arbitration clause. Further, Pasaban argues that the fact that it did not sign the LP License is irrelevant; Enterprises argued—and this Court already determined—that Pasaban Americana (which did sign the LP License) is simply the alter ego of its parent. (*See* Pl.'s Resp. to Mot. to Dismiss at 9, Dkt. #30; *see also* Order at 10, Dkt. #35.) Thus, Pasaban, S.A. can seek arbitration.

Lastly, Pasaban argues that it neither waived nor forfeited its right to seek arbitration. It promptly moved to dismiss on jurisdictional grounds and served preliminary discovery—which it stresses will be relevant in arbitration—only 90 days before seeking arbitration.

## II. DISCUSSION

Under the Federal Arbitration Act, a court's role is "limited to determining (1) whether a valid agreement to arbitrate exists and, if it does, (2) whether the agreement encompasses the dispute at issue." *Chiron Corp. v. Ortho Diagnostic Sys., Inc.*, 207 F.3d 1126, 1130 (9th Cir. 2000) (citation omitted). If the answer to both questions is 'yes,' then "the Act requires the court to enforce the arbitration agreement in accordance with its terms." *Id.* By its own terms, the Act "leaves no place for the exercise of discretion by a district court," instead it mandates "that district courts *shall* direct the parties to proceed to arbitration on issues as to which an arbitration agreement has been signed." *Id.* (citing *Dean Witter Reynolds Inc. v. Byrd*, 470 U.S. 213, 218 (1985)) (emphasis in original).

The Ninth Circuit has stated that "the most minimal indication of the parties' intent to arbitrate must be given full effect, especially in international disputes." *Rep. of Nicaragua v. Std. Fruit Co.*, 937 F.2d 469, 478 (9th Cir. 1991) (citations omitted). Indeed, it is well established "that where the contract contains an arbitration clause, there is a presumption of arbitrability." *AT & T Techs., Inc. v. Commc'ns Workers of Am.*, 475 U.S. 643, 650 (1986).

**A. Is There a Valid Agreement to Arbitrate?**

There is.  Plaintiffs' position—that Pasaban lacks standing to enforce the arbitration clause (Pl.'s Resp. at 5, Dkt. #52)—is entirely untenable.  Enterprises argues that "[it] never consented to arbitration with Pasaban or with any of the individual defendants" and that the FAA does not permit "defendants in this case to enforce the arbitration clause they did not sign."  *Id.*  This argument is bewildering.  Enterprises cannot simultaneously sue Pasaban for breaching the LP License and in the same breath argue that Pasaban cannot invoke the arbitration clause in that agreement.  If Pasaban is bound by the LP License, then Enterprises is equally bound by the arbitration clause in that agreement.

Furthermore, Enterprises itself argued that Pasaban Americana—the actual signatory to the LP License—was simply Pasaban, S.A.'s alter ego, and thus, the parent should be held to the jurisdictional clauses in the LP License.  This Court agreed—making that finding the law of the case.  To bar Pasaban from invoking arbitration would be directly at odds with the Court's prior ruling and Enterprises' own position.

Apart from the law of the case, the parties argue at length the equitable-estoppel principles highlighted in *Mundi v. Union Security Life Insurance, Co.*, 555 F.3d 1042 (2009).  Equitable estoppel "precludes a party from claiming the benefits of a contract while simultaneously attempting to avoid the burdens that contract imposes," which appears to be precisely what Enterprises has attempted.  *Id.* at 1045–46.  In *Mundi*, the Ninth Circuit stated that "a signatory may be required to arbitrate a claim brought by a nonsignatory 'because of the close relationship between the entities involved, as well as the relationship of the alleged wrongs to the non-signatory's obligations and duties in the contract and the fact that the claims were intertwined with the underlying contractual obligations."  *Id.* at 1046 (quoting *E.I. DuPont de Nemours & Co. v. Rhone Poulenc Fiber & Resin Intermediates*, 269 F.3d 187, 199 (3d Cir. 2001)).  Imagining a more appropriate situation for equitable estoppel than this is difficult.

Enterprises argues that the parties' stance is somewhat different from that referenced above: a non-signatory (Pasaban) is attempting to compel signatories (Enterprises and L.-P.) to arbitrate a claim brought by the signatories.  This is no matter; other courts have addressed this

particular layout.  *See Sokol Holdings, Inc. v. MBM Munai, Inc.*, 542 F.3d 354, 359 (2d Cir. 2008) ("a non-signatory to an arbitration agreement may compel a signatory to that agreement to arbitrate . . ." (citation omitted)).  Besides, if anything, this positioning leans in favor of arbitration: a signatory (Enterprises) should be forced to arbitrate claims it has brought, especially where it sues a parent instead of a subsidiary in a transparent attempt to avoid arbitration.  But the positioning is only mildly important.  The other *Mundi* factors compel the conclusion that equitable estoppel is appropriate. The entities are obviously close.  And the alleged wrongs are not merely "intertwined" with the "underlying contractual obligations," Pasaban's alleged wrong *is breaching* the underlying contractual obligation.

This is an easy decision.  The Court previously ruled that Pasaban, S.A. would be treated as Pasaban Americana's alter ego.  Thus, there is no true separation between the signatory subsidiary and the non-signatory parent.  Enterprises, L.-P., and Pasaban Americana agreed to arbitrate any claims "concerning" the LP License.  Enterprises and L.-P. have now brought claims directly under the LP License against Pasaban, S.A. (studiously avoiding Pasaban Americana, the actual signatory).  Those claims are subject to a valid arbitration agreement.

**B.  Does the Agreement Encompass this Dispute?**

It does.  Enterprises' first claim is for breach of the LP License itself, which contains a broad arbitration clause.  The second claim, for breach of the Estoppel Agreement, must be regarded as derivative.  Although it is a separate document, the Estoppel Agreement is intimately linked to the LP License.  Indeed, the Estoppel Agreement is merely a *one-page* document in which Pasaban "approves and consents" to the LP License and agrees it would "not modify" the PA License.  (Lascurain Decl., Ex. B, Dkt. #22-2.)  The Estoppel Agreement is thus intrinsically tied to the LP License; it is a supporting contract, and it is proper that the claim be arbitrated.

Likewise, Plaintiffs' claims for accounting, declaratory judgment, violation of the Washington Consumer Protection Act, and their derivative shareholder claims are ancillary.  These claims all "concern" the LP License and fall within the arbitration clause.

**C. Waiver**

Plaintiffs argues that Pasaban waived or repudiated its right to arbitrate. (Pls.' Resp. at 8, Dkt. #52.) The Ninth Circuit has held that a party arguing waiver of an arbitration provision "bears a heavy burden of proof," since waiver "is not favored" and "[a]ny examination of whether the right to compel arbitration has been waived must be conducted in light of the strong federal policy favoring enforcement of arbitration agreements." *Fisher v. A.G. Becker Paribas Inc.*, 791 F.2d 691, 694 (9th Cir. 1986). A party seeking to establish a waiver must show three things: "(1) knowledge of an existing right to compel arbitration; (2) acts inconsistent with that existing right; and (3) prejudice to the party opposing arbitration from such inconsistent acts." *Samson v. NAMA Holdings, LLC*, 637 F.3d 915, 934 (9th Cir. 2011) (citing *Fisher v. A.G. Becker Paribas Inc.,* 791 F.2d 691, 694 (9th Cir.1986)). The Court must conclude that Enterprises is unable to carry its heavy burden (although its arguments are not meritless).

Enterprises argues that Pasaban repudiated its right to arbitration by previously arguing that China or Spain presented more appropriate venues for litigation. (Pls.' Resp. at 9, Dkt #52.) Further, Enterprises argues that Pasaban unnecessarily hindered service on the Spanish Defendants, moved to dismiss and for a protective order, and have engaged in discovery. (*Id.* at 9–11.) Pasaban was, however, entitled to challenge jurisdiction in this Court. Suggesting that China or Spain were superior venues does not necessitate repudiation. As for discovery, Pasaban argues that the parties commenced only preliminary discovery in conjunction with the Court's scheduling order and filed the current Motion to Compel Arbitration ninety days later. The Court is unconvinced that the discovery already engaged in would be wasted if this dispute was moved to arbitration. Thus, the Court sees little or no prejudice.

Lastly, Enterprises is rightfully concerned about the delay, but the Court is unsympathetic. Enterprises ***knew*** the LP License contained an arbitration clause and has failed to offer ***any*** explanation for why it ignored the clause. To later blame the Defendants for taking too long to invoke that clause is a tad bit presumptuous. Indeed, Enterprises went so far as to exclude Pasaban Americana—the actual signatory to the LP License—from this suit in an effort to avoid the arbitration clause. It does not hold the moral high-ground.

### III. CONCLUSION

For the reasons stated above, the Motion to Stay and Compel Arbitration (Dkt. #50) is **GRANTED**.

Dated this 11th day of February 2013.

Ronald B. Leighton
United States District Judge